# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**WILLIE MATHERS NEWTON,**

     **Petitioner,**

**v.**                                              **Case No. 8:21-cv-142-TPB-SPF**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

     **Respondent.**

_____/

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Willie Mathers Newton, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Having considered the petition, Respondent's response in opposition (Doc. 5), and Newton's reply (Doc. 6), the Court **DENIES** the petition.

## Procedural History

Following a jury trial, Newton was convicted of one count of second-degree murder. (Doc. 5-2, Ex. 9.) The state trial court sentenced him to thirty-five years' imprisonment. (*Id.*, Ex. 11.) The state appellate court affirmed the conviction and sentence without discussion but reversed the trial court's imposition of a $100 fee "for the services of court-appointed conflict counsel." *Newton v. State*, 262 So. 3d 849, 849-50 (Fla. 2d DCA 2018). Newton subsequently moved for postconviction relief under Florida Rule of Criminal

1

Procedure 3.850. (Doc. 5-2, Exs. 16, 18.) The state postconviction court rejected Newton's claims, and the state appellate court *per curiam* affirmed the denial of relief. (*Id.*, Ex. 19; *Newton v. State*, 306 So. 3d 77 (Fla. 2d DCA 2020).) Newton separately filed a petition alleging ineffective assistance of appellate counsel. (Doc. 5-2, Ex. 25.) The state appellate court denied relief. (*Id.*, Ex. 26.) This federal habeas petition followed. (Doc. 1.)

### Factual Background[1]

This case arises from the fatal shooting of Edward R. Williams during an altercation that took place in St. Petersburg, Florida. On January 19, 2015, Williams attended the Martin Luther King Day parade with his brother Vinson and his uncle Timothy Lee. (Doc. 5-2, Ex. 5, at 377, 413.) When the parade ended, the three men made their way to an outdoor "after-party." (*Id.* at 377, 416.) There, Lee encountered Alkeadrea Barber, Newton's cousin. (*Id.* at 385, 456, 545-46.) Lee and Barber "didn't get along," and the two "exchang[ed] words." (*Id.* at 546.) During the exchange, Lee "swat[ted]" at Barber with a bag that contained a folding chair. (*Id.* at 547.)

Later that day, Williams, Vinson, and Lee visited Williams's aunt at her house. (*Id.* at 548-50.) At some point, Newton rode up on a bicycle and confronted Williams and Vinson on the sidewalk. (*Id.* at 385.) Newton asked

---

[1] This factual summary is based on the trial transcript.

2

the brothers why they had "jump[ed] on his cousin"—that is, Barber. (*Id.*) Williams responded, "We didn't do anything to your cousin." (*Id.*) Newton "lunged" at Williams, and the two began to fight. (*Id.* at 482-83.) As the fight went on, Williams began "getting the best of" Newton, who stood approximately six inches taller than Williams. (*Id.* at 402; *id.*, Ex. 6, at 695-96, 739.)

Seeing the fight break out, Lee ran from the porch to the sidewalk. (*Id.*, Ex. 5, at 386.) He was able to separate the two men by "catch[ing] [Newton] by the neck." (*Id.* at 551.) In response, Newton bit Lee on the arm, and Lee "turned him loose." (*Id.*) At that point, a black sedan pulled up, and two men got out of the car. (*Id.* at 389, 485.) Up to this point, no witness had seen a gun on Newton's person. Now, however, Newton had a gun in his hand.[2] (*Id.* at 387, 391-92, 551-52.) Newton fired the gun approximately five times, hitting Williams twice in the chest. (*Id.* at 387, 391-92, 555-56; *id.*, Ex. 6, at 683-86.) Immediately after the shooting, Newton and the two men got into the black sedan and drove off. (*Id.*, Ex. 5, at 489-90.) Vinson, the victim's brother, called 911 and told the operator that Newton had "just shot" Williams. (*Id.*, Ex. 6, at 838-39.)

---

[2] No witness saw the two men hand Newton the gun, but witnesses who were present at the scene of the shooting testified that the gun did not appear until after the black sedan arrived.

Williams's chest wounds proved fatal. (*Id.* at 675-76.) At trial, the medical examiner testified that, based on the absence of "soot or gunpowder" on Williams's skin, Newton was likely standing "at least two feet away" from the victim during the shooting. (*Id.* at 697-98.) The medical examiner also testified that the shots were fired from the victim's left side. (*Id.* at 683-86.) Newton turned himself in to law enforcement on February 4, 2015, approximately two weeks after the shooting. (*Id.* at 790-91.)

## Standards of Review

### AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Newton's conviction and sentence, as well as the denial of postconviction relief, without discussion. These decisions

warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

**Ineffective Assistance of Counsel**

Newton alleges ineffective assistance of trial and appellate counsel. Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

Newton must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had

no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Newton must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). To establish a claim of ineffective assistance of appellate counsel, Newton must show that appellate counsel's performance was objectively unreasonable, and that there is a reasonable probability that, but for this performance, he would have prevailed on his appeal. *Robbins*, 528 U.S. at 285-86.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential.") (internal quotation and citation omitted). "The question [on

7

federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## Discussion

### Ground One

Newton contends that appellate counsel was ineffective for failing to argue on direct appeal that the jury instruction on the lesser-included offense of manslaughter was "fundamentally erroneous."[3] (Doc. 1 at 5.) The trial court gave the standard instruction on manslaughter, informing the jury that, "[t]o prove the crime of [m]anslaughter, the State must prove the following two elements beyond a reasonable doubt: [1] Edward R. Williams is dead[, and] [2] Willie Mathers Newton intentionally committed an act or acts that caused the death of Edward R. Williams." (Doc. 5-2, Ex. 7, at 1063.) Newton's trial counsel did not object to the instruction, and appellate counsel did not raise the issue on direct appeal.

Newton argues that the manslaughter instruction was defective because it allegedly required the jury to find that he "intended to kill" the

---

[3] As noted above, Newton was convicted of second-degree murder. (Doc. 5-2, Ex. 9.)

victim. (Doc. 1 at 5; *see also* Doc. 6 at 8-11.) Thus, according to Newton, appellate counsel should have argued on direct appeal that the instruction was "fundamentally erroneous." (Doc. 1 at 5.) Newton raised this claim in his petition alleging ineffective assistance of appellate counsel. Specifically, he argued that appellate counsel "rendered ineffective assistance" by failing to argue that "the jury instructions [on manslaughter] contained a fundamental error." (Doc. 5-2, Ex. 25, at 3-4.) The state appellate court rejected Newton's claim without explanation. (*Id.*, Ex. 26.)

Newton is not entitled to relief on Ground One. As noted above, Newton's trial counsel did not object to the manslaughter instruction. Thus, the claim for ineffective assistance of *appellate* counsel turns on whether the alleged error was "fundamental" under Florida law. If the alleged error was "not fundamental, then [Newton's] appellate counsel would have been procedurally barred from raising it on appeal, and so he could not have been ineffective for failing to raise it." *Scott v. Sec'y, Dep't of Corr.*, 857 F. App'x 548, 551 (11th Cir. 2021); *see also State v. Delva*, 575 So. 2d 643, 644 (Fla. 1991) ("Instructions . . . are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred.").

By rejecting Newton's ineffective-assistance claim in an unelaborated order, the state appellate court "implicitly" determined that the

9

manslaughter instruction was not fundamentally erroneous. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) (holding that, "[b]ecause the Florida Second District Court of Appeal denied [petitioner's] state habeas petition" without explanation, "the Florida court has already determined, albeit implicitly, that the error was not fundamental error"). "[T]he fundamental error question is an issue of state law, and state law is what the state courts say it is." *Id.* at 1299. Accordingly, this Court "must defer to the [state] court's underlying determination[]" that the manslaughter instruction was not fundamentally erroneous. *Id.* at 1297-98. Because the instruction did not constitute fundamental error, "appellate counsel would have been procedurally barred from [challenging it] on appeal." *Scott*, 857 F. App'x at 551. Counsel "will not be held to have performed deficiently" where, as here, he "fail[s] to perform a futile act, one that would not have gotten his client any relief." *Pinkney*, 876 F.3d at 1297.

Even if the issue of fundamental error were the Court's to decide, Newton would not be entitled to relief. "Fundamental error in a jury instruction requires that the error reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Victorino v. State*, 23 So. 3d 87, 101 (Fla. 2009). Newton fails to show any error in the manslaughter instruction, much less fundamental error.

10

Contrary to Newton's assertion, the trial court did not instruct the jury that manslaughter requires an intent to kill. Newton cites *State v. Montgomery*, 39 So. 3d 252, 254 (Fla. 2010), a Florida Supreme Court case that rejected an earlier pattern instruction for manslaughter. (Doc. 6 at 10.) But the trial court in Newton's case did not give that erroneous instruction. Instead, it tracked the post-*Montgomery* pattern instruction, which correctly requires an intentional act, not an intent to kill. *See Daniels v. State*, 121 So. 3d 409, 416-17 (Fla. 2013) (citing *In re Amendments to Standard Jury Instructions in Criminal Cases—Instruction 7.7*, 75 So. 3d 210, 211-12 (Fla. 2011)). Because the manslaughter instruction in this case was proper, appellate counsel was not ineffective for failing to challenge it on direct appeal. Thus, Ground One is denied.

**Ground Two**

Newton contends that trial counsel provided ineffective assistance by "coercing and advising [him] not to testify on his own behalf." (Doc. 1 at 7.) At trial, counsel argued that Newton was not the shooter, relying primarily on inconsistencies in the eyewitness accounts of the incident. (Doc. 5-2, Ex. 7, at 1010-40.) Newton argues that, instead of advancing an identification defense, counsel should have argued that Newton shot the victim in self-defense. (Doc. 1 at 7.) In Newton's version of events, Vinson started the fight by punching him. (Doc. 5-2. Ex. 18, at 2.) As a result, Newton allegedly "fell into"

11

Williams, and the two began to wrestle. (*Id.*) At this point, Lee allegedly put

Newton in a chokehold and told Vinson to "bring [] the gun off the porch."

(*Id.*) According to Newton, he shot Williams "during the struggle over the

gun." (Doc. 1 at 7.)

Newton contends that, but for counsel's "coercion," he would have

testified at trial in support of his claim of self-defense. (*Id.*) He also argues

that, had the jury heard his testimony, there is "a reasonable probability

[that] the results of the proceeding would have been different." (*Id.*)

The state postconviction court rejected this claim in a detailed written

order. (Doc. 5-2, Ex. 19.) It began by noting that Newton "voluntarily waived

his right to testify." (*Id.* at 3.) In support, the court cited the following

colloquy between the trial court and Newton:

> THE COURT: Have you had sufficient time to discuss with
> your lawyer whether or not you are going to choose to
> testify in this matter?
>
> THE DEFENDANT: Yes, I have.
>
> THE COURT: And what is that decision?
>
> THE DEFENDANT: Not to; not to testify.
>
> THE COURT: Okay. Anybody threaten, force, or make you
> make that decision?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: Anyone promise you anything to get you to
> make that decision?

THE DEFENDANT: No, Your Honor.

THE COURT: You understand that there's a couple decisions that are up to the defendant, and the defendant alone. It's always good to listen to your lawyers, and consider their advice. But two decisions are yours, and yours alone: One, whether you have a trial—and, obviously, your lawyer's honored that.

THE DEFENDANT: Yes, ma'am.

THE COURT: And, two, whether or not you wish to testify. Do you understand that, sir?

THE DEFENDANT: Yes.

THE COURT: Okay. So is this decision yours, and yours alone?

THE DEFENDANT: Yes, it is.

THE COURT: Did you need any more time at all to discuss the issue with your lawyers?

THE DEFENDANT: No, ma'am.

THE COURT: I want you to understand that part of the reason I ask you these questions is, under the law, if you don't like the verdict, this colloquy prevents you from successfully raising, "Oh, I should have testified. I didn't get to tell my story. My lawyers told me not to, and so I just didn't do it, but I wish I did. It's somebody else's fault." The whole reason of these questions is to make sure we get absolutely clear what your decision is during the trial. Do you understand?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. So is this your decision, and yours alone?

THE DEFENDANT: Yes, it is, ma'am.

THE COURT: And what is the decision?

THE DEFENDANT: I will not testify.

THE COURT: Okay. Let the record reflect that the defendant does not wish to testify in this matter, and that[] that decision is freely and voluntarily made.

(Doc. 5-2, Ex. 7, at 907-09.)

Next, the state postconviction court held that "counsel's advice to [Newton] not to testify was reasonable." (*Id.*, Ex. 19, at 4.) The court pointed to several considerations that weighed against Newton testifying. First, Newton "had eight convictions for felonies." (*Id.*) The court noted the "danger" that "the jury may believe [Newton] was more likely to have committed the crime because of his record." (*Id.* at 5.) Thus, the court concluded that "counsel was likely reasonable in advising [Newton] not to testify" "[b]ased on his record alone." (*Id.* at 4.)

Second, the court found that, had he given his "proposed testimony," Newton "would have admitted to shooting the gun in a physically impossible, or at least implausible, scenario." (*Id.* at 5.) As noted above, Newton alleged that "he shot the victim while struggling over the gun." (*Id.*) But, as the court noted, the medical examiner testified that "the victim was shot from his left and that the gun was at least one-and-a-half to two feet away from [the

14

victim] when fired, almost a full arm's-length." (*Id.*) The court found that "[i]t was not physically possible for [Newton] and the victim to be struggling in close quarters over the gun *and* for the victim to be shot twice in the side and chest from at least two feet away to his left." (*Id.*) Thus, according to the court, it "would have been unreasonable" for counsel to "advise[] [Newton] to admit to having his hands on the gun when it went off and testify to doing so when the physical evidence showed that his exculpatory explanation was impossible." (*Id.*)

Third, the court opined that, "had [Newton] testified to having his hands on the gun when the victim was shot, it would have *strengthened* the State's case." (*Id.* at 7.) The court noted that "[o]nly two witnesses actually saw [Newton] with the gun, and one of those witnesses had glaucoma and could not identify [Newton] as the shooter in court." (*Id.*) As a result, "[t]he case hinged on the testimony of Vinson Williams, who was the only witness to affirmatively testify that [Newton] shot the victim, and who had four prior felony convictions." (*Id.*) Thus, "[h]ad counsel advised [Newton] to testify, he would have given the State the shooter." (*Id.*)

Fourth, the court stated that Newton "would have opened himself to cross-examination about a number of issues" had he testified at trial. (*Id.*) Those issues included (1) "the black car and the individuals who came in it," (2) "where [Newton] went after the shooting," (3) "why he failed to call 9-1-1

15

or otherwise report the incident to authorities after being attacked," (4) "why he waited at least two weeks to contact police after he was attacked and acted in self-defense," (5) "how the shots came to hit the victim in his left side from at least two feet away despite his account that he was struggling hand-to-hand with the victim over the gun," and (6) "that he was an 8-time convicted felon." (*Id.* at 7-8.) The court noted that "[a]ny reasonable attorney would have recognized those potential pitfalls." (*Id.* at 8.) Furthermore, the court explained that counsel in fact employed a "ready-made defense based on the testimony at trial: that the witnesses were not consistent, that [Vinson] was not credible, and that someone else, likely one of the men who jumped out of the black sedan, actually fired the shots." (*Id.*)

The court ultimately concluded that "no reasonable attorney, or at least not all reasonable attorneys, would have advised an 8-time convicted felon to take the stand and admit to killing someone with no corroborating evidence to support his claim of self-defense, when the physical evidence would have refuted his testimony and when counsel could make a good faith argument that the defendant did not even fire the gun." (*Id.*) For all these reasons, the court held that Newton "failed to demonstrate that no reasonable attorney would have advised him not to testify." (*Id.*)

The court separately concluded that Newton "ha[d] not shown that what he would have testified to would have created a reasonable probability

16

of a different result" at trial. (*Id.* at 9.) The court reasoned that, to acquit him of second-degree murder, "the jury would have been required to disbelieve the medical examiner's testimony—that the shots were fired from at least one-and-a-half to two feet away to the victim's left—because that evidence directly contradicted [Newton's] account of a close-quarters struggle over the gun." (*Id.*) The jury "would also have had to disbelieve the account of the three eyewitnesses who saw [Newton] attack the victim, the two eyewitnesses who saw him shoot the gun, and the one eyewitness who saw him shoot the victim—whom the jury apparently believed despite the witnesses' felony convictions." (*Id.*) Because Newton "offer[ed] no reason for the jury to have" reached these conclusions, there was no "reasonable probability that the jury would have disregarded the evidence it apparently believed and instead embraced [Newton's] self-serving testimony." (*Id.*) Thus, the court found that Newton failed to satisfy *Strickland*'s prejudice prong as well. (*Id.*)

The rejection of Newton's ineffective-assistance claim was reasonable. "A criminal defendant has a fundamental constitutional right to choose whether to testify in his own defense." *United States v. Anderson*, 1 F.4th 1244, 1253 (11th Cir. 2021). "Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf." *United States v. Teague*, 953 F.2d

17

1525, 1534 (11th Cir. 1992). "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Id.* at 1533. "Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." *Id.* The touchstone of the analysis is whether "counsel's performance fell below an objective standard of reasonableness." *Id.* at 1534.

As an initial matter, the state postconviction court reasonably concluded that counsel did not "coerc[e]" Newton to waive his right to testify. (Doc. 1 at 7.) The trial court engaged in a length colloquy with Newton to ensure that he was voluntarily choosing not to testify. (Doc. 5-2, Ex. 7, at 907-09.) During the colloquy, the trial court made clear that the decision whether to testify was "up to the defendant[] and the defendant alone." (*Id.* at 908.) The court also explained that "part of the reason" for colloquies on the right to testify was to foreclose after-the-fact assertions that counsel prevented a defendant from testifying. (*Id.* at 908-09.) At the end of the colloquy, Newton stated that he would not testify, and that this decision was "[his] alone." (*Id.* at 909.) "It is apparent from th[is] colloquy that [Newton's] counsel did not prevent [him] from testifying or otherwise interfere with his right to take the stand." *Ruiz v. Sec'y, Dep't of Corr.*, No. 8:06-cv-2086-EAK-TGW, 2008 WL

786327, at *4 (M.D. Fla. Mar. 20, 2008). To the contrary, Newton "was well aware of his right to testify and voluntarily chose not to do so." *Id.* Thus, the state postconviction court reasonably rejected Newton's ineffective-assistance claim to the extent it rested on the assertion that counsel coerced him not to testify. *See Jimmy Ho v. Sec'y of Dep't of Corr., State of Fla.*, No. 20-CV-80010, 2020 WL 7890670, at *13 (S.D. Fla. Nov. 5, 2020) (finding that, because the trial court "court conducted a thorough colloquy with [p]etitioner," his "decision not to testify was voluntary and knowingly made, without any deficiency on counsel's part"), *adopted by* 2021 WL 38268 (S.D. Fla. Jan. 5, 2021).

The state postconviction court also correctly concluded that counsel's advice not to testify was reasonable. The court thoroughly explained the strategic considerations that weighed against Newton testifying. If Newton had testified at trial, for example, the prosecution likely would have impeached him with his eight prior felony convictions. Fla. Stat. § 90.610(1). "There are good tactical reasons why it may not be best for the defendant to testify in some circumstances," including "if the defendant might be prejudiced by revelation of prior convictions." *Teague*, 953 F.2d at 1533 n.9; *see also Brown v. Sec'y, Dep't of Corr.*, No. 8:09-cv-934-SDM-AEP, 2012 WL 2936167, at *6 (M.D. Fla. July 18, 2012) ("[P]reventing the disclosure of prior convictions that would prejudice the defendant is a sensible reason for

19

advising against a defendant testifying."). Because the prosecution likely "would have impeached [Newton] with [his prior] convictions, trial counsel was not ineffective for advising him not to testify." *Jenkins v. Sec'y, Dep't of Corr.*, No. 8:18-cv-1643-MSS-AAS, 2021 WL 3550881, at *9 (M.D. Fla. Aug. 11, 2021).

Furthermore, as the state postconviction court explained, Newton's claim of self-defense would have required him to "admit[] to shooting the gun in a physically impossible, or at least implausible, scenario." (Doc. 5-2, Ex. 19, at 5.) Specifically, Newton alleged that he shot Williams during a struggle over the gun, but the medical examiner testified that Newton was likely standing "at least two feet away" from the victim during the shooting. (*Id.*, Ex. 6, at 697-98.) In addition, Newton's testimony "would have given the State the shooter"—an unwise decision considering that only one witness "affirmatively testif[ied] that [Newton] shot the victim," and he "had four prior felony convictions." (*Id.*, Ex. 19, at 7.) Moreover, as the state postconviction court noted, Newton would have faced cross examination on a variety of issues had he testified, including "the black car and the individuals who came in it." (*Id.*) In these circumstances, the Court cannot say that counsel's advice not to testify was "was so patently unreasonable that no competent attorney would have [provided] it." *Dingle v. Sec'y, Dep't of Corrs.*, 480 F.3d 1092, 1099 (11th Cir. 2007).

Finally, the state postconviction court reasonably concluded that Newton was not prejudiced by his counsel's advice not to testify. To show prejudice under *Strickland*, Newton must "establish a reasonable probability that, but for counsel's [advice not to testify], the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). Newton did not meet his burden. As the state postconviction court explained, "[n]othing in the record or [Newton's] allegations demonstrate[d] a reasonable probability that the jury would have disregarded the evidence it apparently believed and instead embraced [his] self-serving testimony." (Doc. 5-2, Ex. 19, at 9.) Among other issues with Newton's proposed testimony, the "unchallenged physical evidence" contradicted his claim that the gun went off during a close-quarters struggle with the victim. (*Id.*) And the jury would have had "multiple reasons to disbelieve and disregard [Newton's] exculpatory testimony"—including "his criminal history" and his decision to "avoid[] police for over two weeks after the shooting." (*Id.*)

For all these reasons, the state postconviction court reasonably rejected Newton's claim that his trial counsel was ineffective for "coercing and advising [him] not to testify on his own behalf." (Doc. 1 at 7.) Therefore, Ground Two is denied.

**Ground Three**

Newton contends that trial counsel was ineffective for pursuing the "bogus defense" that he was not the shooter rather than the "bona fide defense of self-defense." (Doc. 1 at 8.) As in Ground Two, Newton claims that counsel should have advanced the theory that he "was involved in a fight with [the] victim[] that le[d] to a struggle over the gun causing the shooting." (*Id.*) According to Newton, counsel's "actions rendered [the] trial a useless charade," and there is a "reasonable probability [that] the results of the proceedings would have been different" had counsel argued self-defense. (*Id.*)

The state postconviction court rejected this claim for the same reasons it denied Ground Two. (Doc. 5-2, Ex. 19, at 1 n.2.) The court explained that the "substance" of Grounds Two and Three was the same because "the only evidence in support of a defense of self-defense would have come from [Newton's] testimony." (*Id.*) Thus, because Newton "voluntarily chose not to testify," "the only way for [him] to show that counsel should have pursued a defense of self-defense [was] to show that he had a viable defense and counsel misadvised him not to testify to it." (*Id.*) In "the body of th[e] order," the court found that Newton failed to make the required showing. (*Id.*)

The rejection of this claim was reasonable. As explained above, several factors weighed against pursuing a theory of self-defense in this case. Based on those considerations, the state postconviction court correctly concluded

that "no reasonable attorney, or at least not all reasonable attorneys, would have advised an 8-time convicted felon to take the stand and admit to killing someone with no corroborating evidence to support his claim of self-defense, when the physical evidence would have refuted his testimony and when counsel could make a good faith argument that the defendant did not even fire the gun." (Doc. 5-2, Ex. 19, at 8.) Moreover, as the court explained, counsel in fact employed a "ready-made defense based on the testimony at trial: that the witnesses were not consistent, that [Vinson] was not credible, and that someone else, likely one of the men who jumped out of the black sedan, actually fired the shots." (*Id.*) In the circumstances of this case, there is no basis to conclude that the decision to forgo a theory of self-defense "was so patently unreasonable that no competent attorney would have" made the same choice. *Dingle*, 480 F.3d at 1099.

Likewise, the court reasonably found no prejudice from the failure to argue self-defense. As the court explained, "[n]othing in the record or [Newton's] allegations demonstrate[d] a reasonable probability that the jury would have disregarded the evidence it apparently believed and instead embraced [his] self-serving testimony." (Doc. 5-2, Ex. 19, at 9.) Thus, Newton did not "establish a reasonable probability that, but for counsel's [failure to argue self-defense], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.

In sum, the state postconviction court reasonably rejected Newton's claim that counsel was ineffective for failing to argue self-defense. Accordingly, Ground Three is denied.

**Ground Four**

Finally, Newton contends that the trial court violated his federal constitutional rights by denying his motion for judgment of acquittal. (Doc. 1 at 10; Doc. 6 at 17.) He argues that his conviction for second-degree murder "must be reduced to manslaughter" because "the evidence was insufficient to prove the essential element that [his] act was imminently dangerous to another and demonstrated a deprave[d] mind without regard for human life." (Doc. 1 at 10.)

Newton is not entitled to relief on his sufficiency challenge. Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Under *Jackson*, the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the

24

jury is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.*

Consistent with AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Newton fails to show that the state court's rejection of his sufficiency challenge was "objectively unreasonable." *Id.* As noted above, Newton was charged with one count of second-degree murder. Under Florida law, second-degree murder is "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." Fla. Stat. § 782.04(2). "[C]onduct that is imminently dangerous to another and evincing a depraved mind is characterized by an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite, or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life." *Gomez v. State*, 309 So. 3d 691, 693 (Fla. 1st DCA 2019).

Here, the prosecution presented sufficient evidence to establish each element of second-degree murder. As recounted above, Newton confronted Williams and Vinson on the sidewalk outside Williams's aunt's house. (Doc. 5-2, Ex. 5, at 385.) Newton asked Williams and Vinson why they had "jump[ed] on his cousin" earlier that day. (*Id.*) When Williams denied having done "anything to [Newton's] cousin," Newton "lunged" at him. (*Id.* at 482-83.) During the fight that ensued, Williams "g[ot] the best of" Newton, but Lee (Williams's uncle) was able to separate them. (*Id.* at 402, 551.) At that point, a black sedan pulled up, and two men got out of the car. (*Id.* at 389, 485.) Newton then pulled out a gun and fired it approximately five times, hitting Williams twice in the chest. (*Id.* at 387, 391-92, 555-56; *id.*, Ex. 6, at 683-86.) Immediately thereafter, Newton and the two men got into the black sedan and drove off. (*Id.*, Ex. 5, at 489-90.)

Based on this evidence, a rational jury could conclude beyond a reasonable doubt that, after the fight was broken up, Newton retrieved a gun, pointed it at the victim, and fatally shot him twice in the chest. "[T]he act of pointing a loaded firearm in someone's direction and then firing it is imminently dangerous to another and evinces a depraved mind." *Keltner v. State*, 650 So. 2d 1066, 1067 (Fla. 2d DCA 1995); *see also Pierce v. State*, 198 So. 3d 1051, 1052, 1054 (Fla. 4th DCA 2016) (finding "competent substantial evidence . . . that appellant acted with a depraved mind" where appellant

26

"took a gun from his waistband or pocket and shot the victim" immediately after a fight between the two had been broken up); *Conyers v. State*, 569 So. 2d 1360, 1360-61 (Fla. 1st DCA 1990) (affirming second-degree murder conviction where appellant shot victim approximately one minute after bystander had "broke[n] up [a] fight" between them). Thus, because a rational jury could conclude that Newton "acted with the requisite intent to commit second-degree murder," the trial court correctly denied his motion for judgment of acquittal. *Finch v. State*, 299 So. 3d 579, 581 (Fla. 1st DCA 2020).

Ground Four is denied.[4]

## Conclusion

Accordingly, it is **ORDERED** that Newton's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Newton and to **CLOSE** this case.

It is further **ORDERED** that Newton is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute

---

[4] Newton seeks an evidentiary hearing on his claims. The Court concludes that an evidentiary hearing is not warranted. *See Schriro*, 550 U.S. at 474 (stating that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

entitlement to appeal a district court's denial of his petition. 28 U.S.C.

§ 2253(c)(1). Rather, a court must first issue a certificate of appealability. To

obtain a certificate of appealability, Newton must show that reasonable

jurists would find debatable both (1) the merits of the underlying claims and

(2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v.

McDaniel*, 529 U.S. 473, 484 (2000). Newton has not made the requisite

showing. Accordingly, a certificate of appealability is **DENIED**. Leave to

appeal *in forma pauperis* is **DENIED**. Newton must obtain permission from

the circuit court to appeal *in forma pauperis*.

   **DONE and ORDERED** in Tampa, Florida, this 14th day of November,

2023.

              **TOM BARBER**
              **UNITED STATES DISTRICT JUDGE**